AO 91 (Rev. 11/11)  Criminal Complaint

SEALED

FILED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

AUG 13 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Alonzo LOPEZ-VALDIVIA and | ) | 2:19 - MJ 0 1 2 7 - ▇▇ EFB |
| Ramon Eladio CHAIDEZ-AISPURO | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     May 2, 2019 through August 12, 2019     in the counties of     Tehama and Glenn     in the

    Eastern     District of     California     , the defendants violated:

| Code Section | Offense Description |
|---|---|

Count One – 21 U.S.C. § 841(a)(1) (manufacture of at least 100 marijuana plants)

Count Two – 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy to manufacture at least 100 marijuana plants)

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

_____
*Complainant's signature*

Jeremiah Laudenslager, Special Agent
United States Forest Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8-12-2019

_____
*Judge's signature*

City and state:     Sacramento, CA

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF U.S. FOREST SERVICE SPECIAL AGENT
## JERAMIAH LAUDENSLAGER IN SUPPORT OF SEARCH WARRANTS AND
## CRIMINAL COMPLAINT

I, Jeramiah Laudenslager, being duly sworn on oath, depose and say as follows:

### PURPOSE

1. This Affidavit supports an applications for warrants to search the following locations and vehicles:

   i.   1290 Northgate Road Apartment 35, Yuba City, California, further described in Attachment A-1;
   ii.  1837 18th Street, Olivehurst, California, further described in Attachment A-2;
   iii. A 2003 Toyota sedan, silver in color, bearing California license plate 4XUM692, further described in Attachment A-3;
   iv.  A 2006 Hummer H3, silver in color, bearing California license plate 5TNU381, further described in Attachment A-4

2. I believe there is probable cause that the residences and vehicles described in Attachments A-1 through A-4 contain evidence, fruits, proceeds, or instrumentalities in violation of 21 U.S.C. § 841(a)(1) (manufacture of marijuana), and 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy to manufacture marijuana). The evidence, fruits, and instrumentalities to be searched and seized are more fully described in Attachment B.

3. This Affidavit is also made in support of criminal complaints and arrest warrants for the following persons, for violations of 21 U.S.C. § 841(a)(1) (manufacture of at least 100 marijuana plants), and 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy to manufacture at least 100 marijuana plants):

   i.   Alonzo LOPEZ-VALDIVIA; and
   ii.  Ramon Eladio CHAIDEZ-AISPURO

### AGENT TRAINING AND EXPERIENCE

4. I am a Special Agent employed by the United States Forest Service (USFS).  I have been a Special Agent since November 2012.  I am currently assigned to the Mendocino National Forest.  I am authorized, and presently assigned, to investigate and enforce violations of the Controlled Substances Act.  I have received seven months of full time, formalized training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  Portions of that training included the following subjects related to controlled substances offenses: drug identification, detection, smuggling, and interdiction;

undercover operations; money laundering techniques; the manufacture, transportation, concealment, and sales of controlled substances, including marijuana; and the investigation of individuals and organizations involved in such criminal activities.

5.  I have participated in numerous investigations involving controlled substances. I have also conducted countless hours of surveillance, observing and recording movements of persons trafficking drugs and those suspected of trafficking drugs. Additionally, I have participated in and/or executed numerous search warrants authorizing the search of locations such as residences, cell phones, and vehicles related to drug traffickers and their co-conspirators. These investigations have resulted in arrests of numerous individuals, and the seizure of illicit drugs and drug-related evidence. I have also participated in and/or executed several tracker warrants for vehicles.

6.  As a result of my experience, I have become familiar with the day-to-day operations and the various practices, tools, trends, paraphernalia, and related articles utilized by various drug traffickers and manufacturers in their efforts to cultivate, possess, import, conceal, and distribute controlled substances.

7.  During the course of these investigations, I have had the opportunity to discuss at length with other law enforcement officers and agents their investigations of suspects involved in the manufacture and transportation of marijuana. During these conversations, I have discussed the methods and practices used by criminal organizations to manufacture marijuana, evade detection, communicate between workers in the gardens and those outside the gardens, and transport marijuana, equipment, and supplies.

8.  The facts and information set forth in this Affidavit are based upon my personal knowledge and observations, my training and experience, information I have reviewed concerning this investigation, and information and I have received from other law enforcement personnel. Because this affidavit is submitted for the limited purpose of supporting the criminal complaints and securing the requested arrest and search warrants, I have not included the details of every aspect of the investigation. I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the arrest of the individuals named herein, a criminal complaint charging the individuals named herein, and the search and seizure of the properties identified in this Affidavit.

## STATEMENT OF PROBABLE CAUSE

9.  Since early May 2019, agents have been investigating the illegal marijuana cultivation activities on national forest lands of Alonzo LOPEZ-VALDIVIA, Ramon Eladio CHAIDEZ-AISPURO, Martin Alberto MACIAS, Ramiro Lopez PACHECO, and other co-conspirators. During this investigation, agents have identified a marijuana grow site

in a remote area of the Mendocino National Forest, in Tehama County, California ("**Grow Site #1**") and another probable grow site in Glenn County, California ("**Grow Site #2**"), as shown on the map/satellite image below. Drop Sites 1-3 lead to **Grow Site #1** and **Drop Sites 4-5** likely lead to **Grow Site #2**. Agents raided **Grow Site #1** on August 8, 2019, eradicated 906 marijuana plants, and arrested MACIAS and PACHECO at the grow site.



*Agents raid Grow Site #1 and eradicate 906 plants on August 8, 2019.*

10. On August 8, 2019, law enforcement personnel (the "raid team") conducted a raid of **Grow Site #1**. At **Grow Site #1**, California Department of Fish and Wildlife (CDFW) Warden Nick Buckler observed an individual (later identified as MACIAS) dressed in camouflage pants watering the marijuana plants. As Warden Buckler approached the individual, he announced his presence and said "police K-9." MACIAS immediately ran. Warden Buckler sent his K-9, who apprehended MACIAS. MACIAS was apprehended near a live-in camp.

11. Agents continued on a trail leading south from the live-in camp, which led them to more growing marijuana plants. Warden Buckler observed an individual (later identified as PACHECO) watering marijuana plants. As Warden Buckler approached PACHECO, he

again announced his presence, saying "police K-9." PACHECO immediately turned and ran. Warden Buckler sent his K-9, who apprehended PACHECO.

12. Agents eradicated a total of 906 marijuana plants at the cultivation site. The cultivation site consisted of multiple plots, all interconnected by common trails.

13. On August 9, 2019, MACIAS and PACHECO were charged by Criminal Complaint (2:19-mj-125-DB) with manufacturing at least 100 marijuana plants, in violation of 21 U.S.C. § 841(a)(1).

### *Agents identify Drop Point 1 (Grow Site #1) months before the raid, on April 18, 2019.*

14. On April 18, 2019, Tehama County Sheriff's Office (TCSO) Agent Noel Clem and I observed a "Tru-Spec" clothing tag lying on the ground in a turnout on Forest Service Route (FSR) 23N73. FSR 23N73 is a dirt road located off of FSR M-4, in a remote area of the Mendocino National Forest, in Tehama County, in the Eastern District of California. I began surveillance operations on FSR 23N73 at this time utilizing a concealed motion activated camera. According to TCSO Lieutenant Jeff Garrett, this specific turnout ("**Drop Point 1**") has historically been used as a marijuana manufacturing supply drop point. "Tru-Spec" is a camouflage clothing brand commonly used by individuals working and living in a marijuana manufacturing site.

### *Trail camera photos from May 2-12, 2019, show LOPEZ-VALDIVIA and his Hummer visit Drop Point 1 on multiple occasions.*

15. On May 2, 2019, at approximately 7:10 pm, a silver Hummer bearing California license plate 5TNU381 (the "**Hummer**") was photographed traveling on FSR 23N73 and leaving FSR 23N73 about 24 minutes later. The **Hummer** is registered to Alonzo LOPEZ-VALDIVIA at 1290 Northgate APT 35, Yuba City CA (the "**Lopez-Valdivia Residence**").

16. On May 5, 2019, at approximately 4:46 pm, the **Hummer** was photographed traveling on FSR 23N73 towards **Drop Point 1** and then leaving at approximately 4:54 pm. The **Hummer** was photographed returning to FSR 23N73, in the direction of **Drop Point 1**, at approximately 5:08 pm and leaving at approximately 5:14 pm.

17. On May 7, 2019, at approximately 4:49 pm, surveillance images recorded the **Hummer** travelling on FSR 23N73 towards **Drop Point 1** and leaving at approximately 5:05 pm.

18. On May 8, 2019, I placed concealed motion-activated trail cameras at **Drop Point 1**.

19. On May 9, 2019, at approximately 5:01 pm, surveillance images show a Honda Civic (Utah license plate U919W) travelling on FSR 23N73. The Civic is registered to Pedro LOPEZ in Roy, Utah. At approximately 5:02 pm, surveillance images captured the Civic pulling into **Drop Point 1**, a passenger exiting the Civic, and the feet and legs of two individuals walking about. At approximately 5:07 pm, the Civic left and an individual was photographed "brushing tracks" with a Manzanita branch. "Brushing tracks" is a common tactic utilized by drug trafficking organizations ("DTOs") to conceal tire or shoe impressions left behind after a supply drop. I have seen this tactic used numerous times by DTOs manufacturing marijuana on national forest land. I also know that individuals that are using public land for legal purposes generally do not attempt to conceal tire or foot impressions. Several minutes later a Hispanic male adult (later identified as LOPEZ-VALDIVIA) was photographed walking down FSR 23N73 with a manzanita branch in his right hand. At approximately 7:59 pm, two male adults were photographed walking on FSR 23N73 towards FSR M-4. One of the individuals was carrying a "Happy Frog" soil bag. Based upon my training and experience, I know "Happy Frog" soil is commonly used by marijuana growers.

## *LOPEZ-VALDIVIA and CHAIDEZ-AISPURO deliver irrigation pipe to Drop Point 1 on May 13, 2019*

20. On May 13, 2019, I observed numerous tire impressions at **Drop Point 1** and a freshly used trail ("**Trail 1**") leading down the hillside from **Drop Point 1** towards **Grow Site #1**. It should be noted that this is not a designated hiking trail, but rather created as a result of individuals walking back and forth in the same path. Later in the day, around 3:00 pm, I conducted surveillance operations at **Drop Point 1**. A short time later, I observed a grey GMC Canyon pickup truck (California license plate 97533J1) arrive at **Drop Point 1**, with a tarp covering a large load in the bed. The pickup backed up to the trail, and I saw LOPEZ-VALDIVIA, CHAIDEZ-AISPURO, and an unidentified Hispanic man exit, take off the tarp, and remove multiple large rolls of "Poly Pipe," as pictured below. "Poly pipe" is black polyurethane irrigation hose commonly used in marijuana manufacturing sites on national forest land. After the three men took the "poly pipe" down **Trail 1**, I saw LOPEZ-VALDIVIA and CHAIDEZ-AISPURO "brushing tracks" on the road and at **Drop Point 1**. I saw only LOPEZ-VALDIVIA and CHAIDEZ-AISPURO leave with the GMC pickup truck. Based on my training and experience, I believe the unidentified male likely stayed with the supplies to assist the individuals living at the cultivation site. It is common for personnel to be dropped off or picked up periodically at a grow site. In particular, when a manufacturing site's infrastructure is being set up or the product is ready to be harvested, additional personnel will be brought in to assist with the labor. The GMC pickup is registered to an address in Olivehurst, California, which is more than 100 miles away from **Drop Point 1**. I know it is common for forest marijuana cultivators to travel long distances from their residence to

manufacturing sites in an effort to create distance from the criminal activities and to thwart law enforcement efforts to coordinate out-of-jurisdiction surveillance operations.



*LOPEZ-VALDIVIA and CHAIDEZ-ASPURO unloading irrigation pipe*



*LOPEZ-VALDIVIA holding loppers at **Drop Point 1** on May 13, 2019.*

***LOPEZ-VALDIVIA is observed in the vicinity of Grow Site #1 on May 14, 2019.***

21. The next day, on May 14, 2019, at approximately 10:28 am, I observed the **Hummer** parked at 1290 Northgate in Yuba City. As mentioned, the **Hummer** is registered to LOPEZ-VALDIVIA at 1290 Northgate APT 35, Yuba City CA (the **Lopez-Valdivia Residence**).

22. Later that same day, at about 2:30 pm, I and National Guard Counter-Drug (NGCD) members Cari Snyder and Rusty Chambers were travelling west on FSR M-4. We observed the Civic (UT U919W) parked on the side of FSR M-4, approximately 1 mile east of FSR 23N73. I saw an individual who appeared to be LOPEZ-VALDIVIA walk to the driver's side of the Civic with a white paper-like item resembling toilet paper in his hand. Approximately 30 minutes later, Law Enforcement Officer (LEO) Tad Call conducted a traffic stop on the Civic near the national forest boundary for a California Vehicle Code violation. The sole occupant of the vehicle was Cecilia TORRES-GODINEZ. She informed LEO Call that she was visiting a friend and the vehicle belonged to her boyfriend, Pedro LOPEZ. (As noted, the Civic was registered to Pedro LOPEZ.)

**On May 15, 2019, LOPEZ-VALDIVIA and CHAIDEZ-AISPURO are observed at Drop Point 1 and then identified during a traffic stop.**

23. On May 15, 2019, NGCD member Rusty Chambers and I conducted surveillance operations at **Drop Point 1**. At approximately 3:30 pm, I observed a gray Toyota sedan (CA 4XUM692) (the "**Toyota**") backed into the drop point where the trail begins. A short time later CHAIDEZ-AISPURO got into the driver's seat and drove the **Toyota** toward FSR M-4. Moments later CHAIDEZ-AISPURO returned to **Drop Point 1** with a Manzanita branch and began "brushing tracks" left in the drop point area. About a half hour later, I observed the **Toyota** parked, unoccupied near the intersection of FSR M-4 and FSR 23N73 (later identified as "**Drop Point 2**"). At approximately 5:10 pm, surveillance images at **Drop Point 1** captured the legs of two individuals walking toward FSR M-4, one of the individuals wearing camouflage pants. Around one hour later, I observed the **Toyota** travelling east on FSR M-4, toward Paskenta CA. After about 30 minutes the **Toyota** was stopped by Corning Police Department Officer Jeremy Watson for a violation of the California Vehicle Code. CHAIDEZ-AISPURO was driving the **Toyota** and LOPEZ-VALDIVIA was the passenger. CHAIDEZ-AISPURO was identified by a Mexico identification card and LOPEZ-VALDIVIA was identified by his California Driver's License. CHAIDEZ-AISPURO's name was listed on the insurance document provided to Officer Watson. LOPEZ-VALDIVIA was wearing camouflage pants. Based on my training and experience, individuals working in marijuana manufacturing sites usually wear camouflage clothing. These individuals wear camouflage clothing to be less visible and have the ability to hide from law enforcement. The **Toyota** is registered to Martha CHAVEZ at 1837 18th Street, Olivehurst California (the "**Chaidez-Aispuro Residence**").

24. The next day, on May 16, 2019, I observed the **Toyota** parked at the **Chaidez-Aispuro Residence**.

***On May 17, 2019, agents identify suspected Grow Site #2.***

25. On May 17, 2019, at approximately 7:05 pm, the **Hummer** was photographed travelling south on FSR 23N05. FSR 23N05 is approximately 2 miles east of **Drop Point 1**, runs north/south, and travels into Glenn County California. I have been informed by other law enforcement personnel that FSR 23N05 has historically been used to access marijuana grow supply drop points in both Tehama and Glenn Counties in the past. At approximately 7:49 pm, surveillance images show the **Hummer** leaving FSR 23N05. Based on this observation of the **Hummer**, I suspected LOPEZ-VALDIVIA and CHAIDEZ-AISPURO were operating another marijuana grow ("**Grow Site #2**") nearby.

26. Also on May 17, 2019, I began surveillance operations by setting up a motion-activated trail camera on an old logging road ("**Drop Point 3**"), which leads down into the Bowers Creek drainage. This appeared to be a possible alternate way to access **Grow Site #1** in the event **Drop Point 1** is no longer utilized. The old logging road would be easy to navigate and a natural way to walk into the Bowers Creek drainage. This old logging road is located off of FSR M-4 and is approximately .75 miles southeast of **Drop Point 1**.

***On May 21, 2019, agents find Drop Point 1 abandoned and identify new Drop Point 2.***

27. On May 21, 2019, LEO Call and I traveled to **Drop Point 1** and noticed that numerous sticks and branches had been placed along **Trail 1** as it left the supply drop point. There was no fresh sign of human foot traffic on the trail either. Based on my training and experience, I believe the sticks and branches were placed on **Trail 1** in an attempt to conceal the trail. LEO Call and I then looked near the intersection of FSR M-4 and FSR 23N73 where the **Toyota** was parked on May 15, 2019 (**Drop Point 2**). I observed a freshly cut trail ("**Trail 2**") paralleling FSR 23N73 and leading from **Drop Point 2** towards **Grow Site #1**. Later that day, LEO Call and I placed hidden trail cameras at **Drop Point 2**.

***On May 22, 2019, LOPEZ-VALDIVIA is observed picking up an individual who appears to be MACIAS and 2 unidentified males with cultivation tools and supplies at Drop Point 2 in the Hummer before spending approximately 4.5 hours in the area of Grow Site #2.***

28. On May 22, 2019, the **Hummer** spent about 25 minutes near the supply drop area for **Grow Site #2**. At approximately 7:08 am, surveillance images showed the **Hummer** travelling south on FSR 23N05 and leaving FSR 23N05 at approximately 7:35 am.

29. At approximately 8:32 am, surveillance images and video captured two unidentified Hispanic men carrying numerous bags and gear on **Trail 2** towards **Drop Point 2**. At approximately 08:36 am, a third Hispanic man carrying bags and gear was recorded

walking on **Trail 2** to **Drop Point 2**. At approximately 8:43 am, surveillance images show the **Hummer** back into **Drop Point 2**. An individual who appears to be MACIAS and two unidentified men then loaded the back of the **Hummer** with bags, backpacks, at least 2 loppers, at least 3 pick axes, a tent bag and bed rolls. One of these men was wearing a camouflage ball cap, long sleeve shirt and jeans. Another was wearing camouflage pants, a hoodie sweatshirt and ball cap. The third man was wearing camouflage shirt and pants with a hooded jacket on his head. While the three men were loading, LOPEZ-VALDIVIA can be seen approaching the back of the **Hummer** from the driver's side, as if he were driving, as shown in the photograph below. It appears all four men entered the **Hummer** and moments later it drove away.



30. Minutes later, at approximately 8:53 am, surveillance images captured the **Hummer** returning to the supply drop area for **Grow Site #2**, travelling south on FSR 23N05. More than 4.5 hours later, surveillance photos show the **Hummer** leaving FSR 23N05 at approximately 1:27 pm.

31. The next day, on May 23, 2019, the **Hummer** spent about 20 minutes near the supply drop area for **Grow Site #2**. At approximately 2:49 pm, the **Hummer** was photographed travelling south on FSR 23N05, and then leaving at approximately 03:09 pm.

***LOPEZ-VALDIVIA and CHAIDEZ-AISPURO visit Grow Site #1 for approximately three hours on May 25, 2019.***

32. On May 25, 2019, at approximately 2:52 pm, surveillance images at **Drop Point 2** captured the **Toyota**, LOPEZ-VALDIVIA and CHAIDEZ-AISPURO at **Drop Point 2**.

LOPEZ-VALDIVIA was wearing a "Nike Air" shirt, a "California Republic" ball cap and jeans and CHAIDEZ-AISPURO was wearing a collared shirt and jeans. LOPEZ-VALDIVIA and CHAIDEZ-AISPURO were photographed walking down **Trail 2** towards **Grow Site #1** and coming back up **Trail 2** to **Drop Point 2** about three hours later. Below are photographs of LOPEZ-VALDIVIA (left photo) and CHAIDEZ-AISPURO (right photo) walking down **Trail 2** on May 25, 2019.



*On May 29, 2019, surveillance photos show CHAIDEZ-AISPURO and two men (one who appears to be MACIAS) wearing camouflage near Drop Point 3 (Grow Site #2)*

33. On May 29, 2019, at approximately 5:04 pm, surveillance images show CHAIDEZ-AISPURO, wearing a collared shirt, jeans and holding an iPhone, while walking on the old logging road where I identified **Drop Point 3** and placed trail cameras on May 17, 2019. Trail camera photos show CHAIDEZ-AISPURO walk towards FSR M-4, walk back down the old logging road several minutes later, and then walk back towards FSR M-4. About one hour and seven minutes later, at approximately 6:11 pm, an individual who appears to be MACIAS and another unknown individual can be seen walking up the old logging road towards FSR M-4. The unknown individual was dressed in camouflage pants, camouflage long sleeve button up shirt and camouflage hat, and was carrying a bag. The individual who appears to be MACIAS was dressed in camouflage pants, a long sleeve shirt and hat, and was carrying a crate and bag. Below are photographs of CHAIDEZ-AISPURO and the individual who appears to be MACIAS near **Drop Point 3** on May 29, 2019.



***On June 5, 2019, LOPEZ-VALDIVIA's Hummer makes a supply drop at Drop Point 2 after visiting Grow Site #2.***

34. On June 5, 2019, the **Hummer** spent about an hour and 45 minutes near the supply drop area for **Grow Site #2**. At approximately 10:20 am, surveillance images captured the **Hummer** travelling south on FSR 23N05. At approximately 12:04 pm, surveillance images showed the **Hummer** leaving FSR 23N05. Below are two of these surveillance images.



35. A few minutes later, at approximately 12:10 pm, surveillance images show the **Hummer** pull into **Drop Point 2**, a supply drop for **Grow Site #1**. An individual in camouflage pants and long sleeve shirt walked in front of the **Hummer** with a "Bud Light" in his hand. At approximately 12:13 pm, MACIAS, dressed in camouflage pants and long sleeve shirt, carried five dozen eggs, three bags of "Animalitos" cookies, and two blue handled loppers down **Trail 2**. An individual who appears to be PACHECO, dressed in a green button up long sleeve shirt, camouflage pants and camouflage hat, carried a large black trash bag filled with items on his shoulder and a dome tent bag down **Trail 2**. The two men then walked back towards **Drop Point 2** and MACIAS returned down **Trail 2** with a bag of apples, a bag of tomatoes, a bag of jalapeno peppers, bananas, oatmeal and

other items, and then ran back towards **Drop Point 2**. The man who appears to be PACHECO returned down **Trail 2** with a hand saw, a case of "Coca-Cola" and a bag of tortillas, and then ran back towards **Drop Point 2**. MACIAS returned with a cooking pot filled with items. They both stood on **Trail 2** and MACIAS lit what I recognized to be a marijuana "joint" and began to smoke it while holding a "Bud Light" can. Then the man who appears to be PACHECO walked back toward **Drop Point 2** and returned down **Trail 2** with a Styrofoam ice chest and a hand saw. At approximately 12:22 pm, about 12 minutes after arriving, the **Hummer** drove away from **Drop Point 2**. I have previously observed the items unloaded at **Drop Point 2** and know they are routinely used in marijuana manufacturing sites in the national forests. Below are two examples of the surveillance photos described in this paragraph.

 

*Agents identify Drop Point 4 at Grow Site #2 on June 7, 2019.*

36. On June 7, 2019, LEO Call and I travelled to FSR 23N05 to determine where the suspect vehicles travelled and determine whether there was an additional drop point for suspected **Grow Site #2**. I observed a location on FSR 23N05 where a vehicle had recently turned around ("**Drop Point 4**") and a section of trail ("**Trail 4**") leading down into the Salt Creek Drainage, towards suspected **Grow Site #2**. I placed trail cameras at **Drop Point 4** at this time.

*LOPEZ-VALDIVIA, MACIAS, PACHECO, and an unidentified man make a large supply drop for Grow Site #2 on June 8, 2019.*

37. On June 8, 2019, at approximately 9:49 am, surveillance images at **Drop Point 3** showed PACHECO, who was wearing a long sleeve shirt, camouflage pants and a full brim hat, carrying a large Tupperware container with spray paint on the lid to **Drop Point 3**. A couple minutes later MACIAS, wearing a long sleeve shirt, camouflage pants, a ball cap, a backpack and facial hair, was photographed carrying a similar container to **Drop Point 3**.

38. About 20 minutes later, at approximately 11:13 am, surveillance images captured the **Hummer** backing into **Drop Point 4**, which is approximately 1.72 miles from **Drop Point 3**. LOPEZ-VALDIVIA, dressed in blue jeans, a blue shirt and white ball cap, opened the back of the **Hummer**, with an unidentified Hispanic man (FNU LNU #3), dressed in full camouflage clothing with a green backpack, standing next to him. Several minutes later, LOPEZ-VALDIVIA opened the passenger side door and began removing items. FNU LNU #3 picked up a propane tank and carried it toward the trail while LOPEZ-VALDIVIA continued to remove items from the front passenger compartment. FNU LNU #3 walked back over to LOPEZ-VALDIVIA and moved a white grocery bag and a brown paper bag toward the back of the **Hummer**. LOPEZ-VALDIVIA handed FNU LNU #3 a grocery bag and FNU LNU #3 took the grocery bag and a large potato chip bag and put them in the back of the **Hummer**. LOPEZ-VALDIVIA handed FNU LNU #3 onions and another item and FNU LNU #3 put them in the back of the **Hummer**. LOPEZ-VALDIVIA appeared to shuffle items around in the rear passenger compartment while holding a grocery bag in his left hand. After a few minutes, LOPEZ-VALDIVIA walked toward the trail and then returned while FNU LNU #3 closed the rear passenger door and appeared to get in into the front passenger seat of the **Hummer**.

39. At approximately 11:51 am, surveillance images showed the **Hummer** pull into **Drop Point 3**. An individual (possibly MACIAS), dressed in camouflage pants and a long sleeve shirt, stepped out of the left rear passenger door with two Walmart grocery bags and walked behind the **Hummer**. The back compartment of the **Hummer** opened and closed and an individual (possibly MACIAS), dressed in camouflage pants, got into the left rear passenger door. Moments later, the **Hummer** backed out of **Drop Point 3**.

40. Minutes later, at approximately 12:08 pm, surveillance images showed the **Hummer** return to **Drop Point 4**. FNU LNU #3 carried two white crate type items from the area of the **Hummer** toward **Trail 4** while PACHECO carried two large blue Tupperware containers from the area of the **Hummer** towards **Trail 4**.

41. More than six hours later, at approximately 6:33 pm, surveillance images captured MACIAS and PACHECO walk from **Trail 4** to **Drop Point 4**, towards FSR 23N05.

***An individual believed to be LOPEZ-VALDIVIA and two other men (who appear to be MACIAS and PACHECO) carry "clone" marijuana plants from Drop Point 2 toward Grow Site #1 on June 10, 2019.***

42. On June 10, 2019, at approximately 2:18 pm, surveillance images captured LOPEZ-VALDIVIA's **Hummer** backed up to **Trail 2** at **Drop Point 2**. Photographs showed the rear compartment of the **Hummer** opened and an individual with a similar build as LOPEZ-

VALDIVIA, dressed in cargo shorts, a ball cap and a "Nike Air" shirt like the shirt LOPEZ-VALDIVIA was wearing on May 25th at **Trail 2**, carrying three Home Depot boxes down **Trail 2**. One of the Home Depot boxes had the leaves and stems of marijuana plants sticking out of the top of the box. I recognized these as "starter plants" or "clones" that are typically grown at an off-site location and brought to the grow site when they are several inches to a foot tall. Using "starter plants" or "clones" cuts the amount of time needed on-site until harvest, reducing the chance of the illegal grow site being detected. Furthermore, based upon my training and experience, I know that a "cloned" marijuana plant is taken from a female "mother" plant guaranteeing that the "cloned" plant will provide flowers or "buds." Approximately two minutes later, the individual believed to be LOPEZ-VALDIVIA returned to the **Hummer** and carried three more Home Depot boxes down **Trail 2**. Two of the Home Depot boxes had the leaves and stems of marijuana plants protruding from the top of the box, as seen in the photographs below. The same individual returned twice more to the **Hummer** and each time carried two more Home Depot boxes down **Trail 2**. Trail camera photos show him walk back to the **Hummer** and then the **Hummer** is not in the next picture.







43. About 18 minutes later, at approximately 2:36 pm, trail camera photos captured a man who appears to be MACIAS, dressed in camouflage pants, long sleeve shirt, ball cap and a camouflage backpack, walking from **Trail 2** toward **Drop Point 2** and then back down **Trail 2**, away from the drop point. At about 2:50 pm, an individual who appears to be PACHECO, dressed in camouflage pants, camouflage long sleeve shirt and full brim hat, walked from the direction of **Trail 2** toward **Drop Point 2** and the man who appears to be MACIAS followed without the backpack.  At approximately 3:17 pm, the man who appears to be MACIAS carried two Home Depot boxes from **Drop Point 2** down **Trail 2** and the man who appears to be PACHECO followed carrying several Styrofoam cups containing small marijuana plants. The man who appears to be PACHECO then went back to **Drop Point 2** and walked back down **Trail 2** with at least 3 Styrofoam cups containing small plants.  Sample surveillance photos of the two men carrying cups with marijuana plants and the Home Depot boxes are shown below.



44. Later that day, the **Toyota** spent about 25 minutes near the supply drop area for **Grow Site #2**.  At approximately 4:00 pm, surveillance images captured the **Toyota** travelling south on FSR 23N05.  At approximately 4:27 pm, surveillance images showed the **Toyota** travelling north on FSR 23N05, away from **Grow Site #2**.

***Agents confirm LOPEZ-VALDIVIA's residence as 1290 Northgate Drive, Apt 35, Yuba City.***

45. On June 11, 2019, SA Nick Roe was conducting surveillance operations on APT 35 at 1290 Northgate Drive in Yuba City.  At approximately 2:55 pm, SA Roe observed the **Hummer** parked near the staircase that provides access to APT 35.  LOPEZ-VALDIVIA

exited the driver's seat and walked to the back of the **Hummer** where he met TORRES-GODINEZ, who had exited the passenger side. LOPEZ-VALDIVIA and TORRES-GODINEZ removed some boxes and a plastic bag which appeared to contain food items, walked up the staircase to the front door of APT 35, and unlocked the door and went inside. They both returned to the **Hummer** and retrieved more items and carried them into APT 35. LOPEZ-VALDIVIA then walked back down the stairs and got into the **Hummer** and drove away.

**On June 12, 2019, LOPEZ-VALDIVIA and CHAIDEZ-AISPURO purchase supplies at Home Depot and Walmart in Chico while driving the Hummer, which GPS tracker data shows at Grow Site #2 a couple hours later.**

46. On June 10, 2019, the Honorable Edmund F. Brennan signed search warrants authorizing the installation and monitoring of tracking devices on the **Hummer** and the **Toyota** for a period of 45 days. Pursuant to the warrants, in the early morning hours of June 12, 2019, SA Roe and I installed GPS tracking devices on the **Hummer** and the **Toyota**.

47. On June 12, 2019, GPS tracker data showed the **Hummer** stopped at Home Depot in Chico between about 6:17 pm, and 6:27 pm. At a later date LEO Call obtained surveillance footage from the Home Depot Asset Protection Specialist. Surveillance footage captured LOPEZ-VALDIVIA dressed in a blue V-neck shirt and white hat, exiting the store with two orange Home Depot buckets and CHAIDEZ-AISPURO wearing a camouflage ball cap with sunglasses on the bill, following behind.

48. Subsequent tracker data shows the **Hummer** at Walmart in Chico between about 6:33 pm and 6:55 pm. At a later date SA Roe and I obtained surveillance footage from the Walmart Lost Theft Prevention department. Surveillance footage captured LOPEZ-VALDIVIA dressed in a blue V-neck shirt, grey shorts and white hat standing at the checkout register and paying with cash. According to a receipt of the transaction, LOPEZ-VALDIVIA purchased a can of black spray paint and a can of green spray paint, a three-person dome tent, 5 bags of flower food, and two other items. At the end of the transaction, CHAIDEZ-AISPURO walked to the register and pushed the shopping cart out of the store. CHAIDEZ-AISPURO was dressed in a green shirt, camouflage ball cap with sunglasses on the bill and blue jeans. The green shirt has a white bear logo on the chest which says "King of the Wild." CHAIDEZ-AISPURO was photographed wearing this same shirt on May 13, 2019, at **Drop Point 1**.

49. At about 9:19 pm, GPS tracker data showed the **Hummer** stopped at a location on FSR 23N05 (identified as "**Drop Point 5**" during surveillance the following day). The next day, on June 13, 2019, SA Roe and I travelled to the location of **Drop Point 5** (GPS coordinates N39 47.697 by W122 40.736), which is approximately .07 miles north of

Drop Point 4. At this location, I observed fresh tire impressions on FSR 23N05 indicating a vehicle had turned around and fresh signs of human travel leading downhill ("Trail 5") – specifically, bare mineral soil free of debris indicating individuals had walked in the same path multiple times. I placed trail cameras and began surveillance operations on Drop Point 5 at this time.

*On June 14, 2019, LOPEZ-VALDIVIA and CHAIDEZ-AISPURO make supply drops at Grow Site #1 (Drop Point 2) and Grow Site #2 (Drop Point 5).*

50. On June 14, 2019, at approximately 9:16 am, according to tracker data, the **Hummer** went to Home Depot in Orland, California. According to Home Depot surveillance footage obtained by LEO Hembree, at approximately 9:17 am, an individual who appears to be LOPEZ-VALDIVIA entered Home Depot wearing a white ball cap, white shirt, and shorts. At approximately 9:21 am, LOPEZ-VALDIVIA was standing at the register with a piece of dimensional lumber. According to the receipt provided by Home Depot, item 769887005095 1x2x8 FVRR was purchased at 9:22 am, for $25.46 and paid for with $50.00 cash.

51. Later that same morning, at approximately 11:14 am, I observed the **Toyota** at "Loves" gas station in Corning, CA. I observed the **Toyota** parked at a gas pump and CHAIDEZ-AISPURO, dressed in a maroon collared shirt and sunglasses, running toward the **Toyota** from the convenience store. After getting gas, CHAIDEZ-AISPURO drove away in the **Toyota**. CHAIDEZ-AISPURO was the only occupant observed in the **Toyota**.

52. Minutes later, at approximately 11:35 am, GPS tracker data showed both the **Hummer** and the **Toyota** stopped at the Flournoy School on Paskenta Road. Soon thereafter, the **Hummer** began traveling west on Paskenta Road, towards **Drop Point 2**, while the **Toyota** remained stopped.

53. About 35 minutes later, at approximately 12:10 pm, surveillance images at **Trail 2** captured two individuals (MACIAS and an individual who appears to be PACHECO) dressed in camouflage pants and long sleeve shirts walking from **Trail 2** to **Drop Point 2**. A few minutes later, they began shuttling supplies from **Drop Point 2** down **Trail 2**. At approximately 12:15 pm, GPS tracker data shows the **Hummer** stopped at **Drop Point 2**. Some of the supplies included two spray painted buckets, three large white bags resembling fertilizer or potting soil, a box of "cup of noodles," and numerous grocery bags containing laundry soap and other items. Another individual with the same build as CHAIDEZ-AISPURO dressed in a collared shirt, jeans and a camouflage ball cap, walked multiple times up and down **Trail 2** from **Drop Point 2**. On one of those occasions he is carrying a riding lawn mower size battery. Another individual with the same build as LOPEZ-VALDIVIA dressed in a shirt, camouflage cargo shorts and ball

cap, was photographed in the distance and walked down **Trail 2** and back to **Drop Point 2**.  At approximately 12:29 pm, the two individuals dressed in camouflage pants and long sleeve shirts walked back down **Trail 2**.

54. At approximately 12:36 pm, surveillance images captured the **Hummer** traveling south on FSR 23N05.  At approximately 12:44 pm, surveillance images at **Drop Point 5** captured the **Hummer** arrive at **Drop Point 5**.  GPS tracker data also confirmed the **Hummer** was at **Drop Point 5** at this time.  LOPEZ-VALDIVIA, dressed in a white shirt, shorts and white ball cap, opened the back compartment of the **Hummer**.  LOPEZ-VALDIVIA carried a piece of dimensional lumber, like the dimensional lumber purchased from Home Depot, off the side of the road in the area where fresh signs of human traffic were observed earlier (**Trail 5**).  CHAIDEZ-AISPURO, dressed in a collared maroon shirt, jeans and a camouflage ball cap, carried a large white bag similar to a 50 pound bag of fertilizer from the back of the **Hummer** off the side of the road.  LOPEZ-VALDIVIA and CHAIDEZ-AISPURO unloaded several additional items from the **Hummer**, including a white bag similar to a 50 pound bag of fertilizer, and carried them to the side of the road.  LOPEZ-VALDIVIA appeared to get into the **Hummer** and to turn around and travel north on FSR 23N05.  CHAIDEZ-AISPURO got a branch and proceeded to "brush tracks" on the road, as shown in the photo below.





55. After the supply drop, GPS tracker data showed the **Hummer** travel from **Drop Point 5** and stop at the Flournoy School at approximately 1:31 pm.  Several minutes later, GPS tracker data showed the **Toyota** depart from the Flournoy School, where it had been parked.  Beginning at approximately 3:41 pm for approximately 29 minutes, the **Toyota** was at 1169 Janet Avenue, Olivehurst, California, the registered address for the GMC pickup in which LOPEZ-VALDIVIA and CHAIDEZ-AISPURO delivered the irrigation pipe to **Drop Point 1** on May 13, 2019.  Olivehurst is approximately 100 miles from **Drop Point 5**.  From 1169 Janet Avenue, GPS tracker data showed the **Toyota** travel to and stop at 1836 18th Street, Olivehurst, CA, which is immediately across the street from the **Chaidez-Aispuro residence** (1837 18th Street).

### On July 1, 2019, LOPEZ-VALDIVIA and CHAIDEZ-AISPURO visit the supply drop area for Grow Site #2 after purchasing supplies at Home Depot and Walmart in Chico.

56. On July 1, 2019, at approximately 11:00 am, GPS tracker data revealed that the **Toyota** was parked within fifty feet of the **Hummer** at a shopping center parking lot in Live Oak, California.

57. At approximately 12:15 pm, tracker data showed the **Hummer** had moved away from the **Toyota** and was traveling north on California Highway 99 and that the **Toyota** remained in the parking lot.  At approximately 12:40 pm, tracker data showed the **Hummer** parked in the Home Depot parking lot in Chico, California.  According to Home Depot surveillance footage obtained by LEO Nick Laprade, CHAIDEZ-AISPURO and LOPEZ-VALDIVIA entered the store.  CHAIDEZ-AISPURO was wearing a blue collared shirt and blue jeans and LOPEZ-VALDIVIA was wearing a teal V-neck shirt and blue jeans.  After walking around the store for approximately 30 minutes, LOPEZ-VALDIVIA proceeded to the check out where he purchased two bundles of rope and two rolls of Gorilla Tape.  CHAIDEZ-AISPURO was seen waiting in the immediate area for the completion of the purchase.

58. At approximately 1:02 pm, tracker data showed the **Hummer** parked in the Wal-Mart parking lot in Chico, California.  As described above, on June 12, 2019, surveillance captured CHAIDEZ-AISPURO and LOPEZ-VALDIVIA purchasing items from that same Wal-Mart and traveling together in the **Hummer**.  According to Walmart surveillance footage obtained by LEO LaPrade, at approximately 1:29 pm, CHAIDEZ-AISPURO and LOPEZ-VALDIVIA entered Wal-Mart via the lawn and garden entry.  CHAIDEZ-AISPURO appeared to be wearing a blue shirt and no hat.  LOPEZ-VALDIVIA appeared to be wearing a teal V-neck shirt and no hat.  According to LEO LaPrade, it was during this video feed that it appeared that CHAIDEZ-AISPURO turned around and went back to either the vehicle or waited near the entrance as LOPEZ-

VALDIVIA entered the store to pay for a propane exchange. At approximately 1:32 pm, LOPEZ-VALDIVA conducted a cash transaction for a propane exchange confirmed by Wal-Mart Smart Inventory System for a total of $16.00. LOPEZ-VALDIVA exited the store, where he went to the **Hummer** and got into the front passenger seat.

59. At approximately 3:04 pm, SA Roe was parked near FSR M-4 when he observed the **Hummer** pass his location heading in the direction of the supply drop point.

60. At approximately 3:22 pm, surveillance footage at **Drop Point 5** revealed a Hispanic man (FNU LNU #3) dressed in camouflage long sleeve shirt, green pants and a camouflage ball cap standing at **Drop Point 5**.

61. At approximately 3:24 pm, trail camera photographs showed the **Hummer** arrive at **Drop Point 5**, turn around, and back just out of view. CHAIDEZ-AISPURO, dressed in a blue collared shirt, blue jeans, sandals and a backwards camouflage ball cap, walked to the side of FSR 23N05. He turned his ball cap forward as he walked back towards the **Hummer**. About 35 minutes later, at approximately 4:01 pm, the **Hummer** drove forward into view, CHAIDEZ-AISPURO walked to the passenger side, and the **Hummer** drove north on FSR 23N05.

62. At approximately 4:37 pm, tracker data shows the **Hummer** at a turnout .25 miles northeast of **Drop Point 3**.

63. At approximately 4:52 pm, SA Roe observed the **Hummer** pass back by his location, but this time the **Hummer** was traveling east towards Paskenta. SA Roe followed the **Hummer** east on Corning Road through Paskenta towards Corning, California. At approximately 5:15 pm, SA Roe observed the **Hummer** parked on the south side of Corning Road, approximately eight miles west of Corning, California. The driver exited the vehicle and walked to the south side of Corning Road to relieve himself. As SA Roe passed by the **Hummer**, he recognized the driver to be LOPEZ-VALDIVIA. LOPEZ-VALDIVIA was wearing a V-neck shirt that appeared teal in color.

64. At approximately 5:27 pm, SA Roe was getting gas at the Chevron station in Corning, California and observed LOPEZ-VALDIVIA pull into the parking lot and exit the driver's seat of the **Hummer**. LOPEZ-VALDIVIA went into the Chevron gas station store. While LOPEZ-VALDIVIA was parked at the Chevron gas station store, SA Roe observed an individual seated in the front passenger seat. LOPEZ-VALDIVIA walked out of the Chevron gas station store holding what appeared to be a candy bar.

65. At approximately 5:30 pm, LOPEZ-VALDIVIA got into the driver's seat of the **Hummer** and left the parking lot. SA Roe and I followed the **Hummer** to the shopping center parking lot, in Live Oak, where the **Toyota** was parked. At approximately 6:35 pm, SA Tyler Bolen was parked near the **Toyota** in the same parking lot. SA Bolen observed the **Toyota** was not occupied by anyone. SA Bolen photographed the **Toyota** and within a few minutes the **Hummer** arrived and stopped directly behind SA Bolen and near the **Toyota**. SA Bolen observed two Hispanic males in the **Hummer**. They appeared to be having a conversation. At approximately 6:50 pm, the front passenger left the **Hummer** and walked over to the driver side door of the **Toyota**. SA Bolen observed him open the driver side door of the **Toyota**, sit down in the driver seat, and drive on to southbound Highway 99. There were no other persons in the **Toyota**. The passenger in the **Hummer** and eventual driver of the **Toyota** was a Hispanic male, wearing a backwards camouflage hat with bright emblem (gold or orange in color), a blue striped colored shirt, and blue jeans with a beard.

66. At approximately 6:55 pm, SA Roe and I observed the **Hummer** and the **Toyota** travel south on California Highway 99 towards Yuba City. As the **Toyota** was travelling south on Live Oak Blvd, I passed the **Toyota** and recognized the driver as CHAIDEZ-AISPURO. SA Roe followed the **Toyota** to 1837 18th Street, Olivehurst, where it parked at approximately 7:20 pm.

67. SA Bolen viewed the **Hummer**, via live tracker, drive south on Highway 99 to Yuba City. Minutes later, the **Hummer** pulled into a parking lot south of a Wells Fargo Bank located at 900 Colusa Ave., Yuba City. SA Bolen observed a Hispanic male wearing a blue shirt standing next to the **Hummer** holding a cell phone to his ear. It appeared to be the same male that SA Bolen recently saw driving the **Hummer**. There was nobody else with him. A short time later, SA Bolen observed the **Hummer** leave and drive north on Gray Avenue. Minutes later, live tracker showed the **Hummer** stop. At approximately 7:36 pm, SA Bolen observed this location and observed the **Hummer** parked in the uncovered general parking lot of the Northgate Terrace Apartments located at 1290 Northgate Drive, Yuba City.

***Agents obtain additional information that Chaidez-Aispuro resides at 1837 18th Street, Olivehurst.***

68. On July 2, 2019, at 5:21 pm, tracker data showed the **Toyota** at 1837 18th Street. At approximately 5:40 pm, SA Roe and LEO LaPrade conducted surveillance operations on CHAIDEZ-AISPURO in the vicinity of 1837 18th Street, Olivehurst. Tracker data allowed them to follow the **Toyota** to an ARCO Gas Station in Marysville, where SA Roe observed CHAIDEZ-AISPURO exit the **Toyota**, and walk into the ARCO store

front.  Upon exit, CHAIDEZ-AISPURO filled the vehicle up with gas and returned to the driver's seat.  Once completed at the Arco Station, CHAIDEZ-AISPURO drove the **Toyota** across the street, when he entered the drive-thru line of Burger King.  As he drove by, the agents observed the front seat passenger to be Martha Chavez (the registered owner of the **Toyota**) of 1837 18th Street, Olivehurst and another female sitting in the back seat.  After exiting the Burger King Drive-Thru, CHAIDEZ-AISPURO drove the **Toyota** through the adjacent Wal-Mart Parking Lot and made a left turn onto N Beale Road.  Shortly after this time they lost visual of the vehicle and set-up on 1837 18th Street.  About 5 minutes later, at approximately 6:25 pm, the **Toyota** returned to 1837 18th Street and Agent Roe traveled west down the street, where LEO LaPrade was able to conduct a roll-by video of the vehicle parked at the driveway from the front passenger seat.  As they passed by, SA Roe observed a child closing the door to the residence.

69. On July 5, 2019, SA Roe and LEO LaPrade were conducting surveillance on the **Toyota**. At approximately 11:15 am, the **Toyota** was parked in the Home Depot parking lot in Yuba City. SA Roe observed CHAIDEZ-AISPURO exit the driver's seat and jog into the west side entrance of the Home Depot.  CHAIDEZ-AISPURO was wearing a camouflage baseball style hat, dark colored t-shirt, blue jeans and sandals with cream colored straps that wrap around the ankle. SA Roe watched him load the items he purchased from Home Depot into the trunk of the **Toyota**.  After loading the items into the trunk CHAIDEZ-AISPURO then got into the driver's seat of the **Toyota** and drove away.

70. At approximately 1:26 pm, SA Roe observed CHAIDEZ-AISPURO walk into Feather River Tobacco Shop.  CHAIDEZ-AISPURO exited the tobacco shop and got into the driver's seat of the **Toyota**.  CHAIDEZ-AISPURO was the only person in the **Toyota**. SA Roe observed CHAIDEZ-AISPURO drive the **Toyota** to Antonio's Quick Lunch located approximately half a mile from the tobacco shop.

71. At approximately 1:37 pm, SA Roe observed CHAIDEZ-AISPURO park the **Toyota** at the Mini Mart located at the Kwik Serv.  A short time later SA Roe observed CHAIDEZ-AISPURO get into the **Toyota** and drive away.

72. Throughout agents' surveillance of the **Toyota** during this investigation on at least 7 occasions between May 15, 2019 and July 25, 2019, they have never observed anyone other than CHAIDEZ-AISPURO drive the **Toyota**, except that on one occasion, on June 21, 2019, the **Toyota** was contacted by the Tehama County Sheriff's Office as it was parked on the side of Gyle Road, and LOPEZ-VALDIVIA was the driver and CHAIDEZ-AISPURO was the passenger.  The only other passengers agents have ever observed in the **Toyota** were: (i) on July 2, 2019, when they observed CHAIDEZ-

AISPURO driving with Maria Chavez, the registered owner who lists 1837 18th Street, Olivehurst on the registration, and another unidentified female as passengers; (ii) on May 15, 2019, when Corning Police Department stopped the **Toyota**, CHAIDEZ-AISPURO was driving and LOPEZ-VALDIVA was the passenger; and (iii) on July 25, 2019, where SA Roe and I observed the Toyota at Loves gas station in Corning, CHAIDEZ-AISPURO was driving and LOPEZ-VALDIVA was the passenger.

73. Tracker data shows that throughout the court-authorized tracking periods (June 12, 2019, through July 25, 2019 and August 6, 2019, through August 11, 2019), the **Toyota** was consistently parked at or in the immediate vicinity of 1837 18th Street, Olivehurst (the **Chaidez-Aispuro Residence**) during nighttime hours.

### AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

74. Based on my training and experience, and consultations with other federal, state, and local law enforcement personnel, I believe the following to be true:

75. Marijuana cultivation operations are usually continuous, ongoing endeavors. I know that people involved in marijuana cultivation operations often maintain evidence of marijuana cultivation on their person (e.g., their cellular telephone or clothing), at their residence (evidence of involvement in marijuana growing operations), and in their vehicles (same).

76. Marijuana manufacturers use an assortment of equipment to plant and maintain their product. This equipment includes, but is not limited to, irrigation devices, garden hoses, five gallon buckets, ground timing devices, electronic watering devices, aerators, PVC pipes, water storage devices, lights, timers, power cords, generators, shovels, rakes, pruning shears, hand-held sprayers, herbicides, starter pots, planter pots, grow pots, paper bags, burlap bags and plastic storage containers.

77. Marijuana manufacturers also use an assortment of equipment for the use, storage, processing and packaging of marijuana, including rolling papers, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, scales, and other weighing devices, drying screens, pouches, backpacks, plastic storage containers, surveillance/monitoring devices, and alarm sensors. Marijuana manufacturers will commonly package their product where it is produced and also at their residences. With respect to marijuana, this packaging could include, but is not limited to, scales to weigh the marijuana, plastic baggies, large plastic garbage bags, boxes, buckets, and heat sealers to package the marijuana for sale. This equipment is commonly kept on the property, including inside structures on the property near where the marijuana is kept or is being cultivated.

78. Individuals involved in marijuana distribution often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying strains of marijuana. Marijuana manufacturers and traffickers will generally keep a supply of marijuana on hand for immediate sale. The drugs are commonly kept on their person and in locations associated with the traffickers, including in the home or in the vehicles of, or used by, the manufacturers. Manufacturers will often hide their supply of marijuana in garages, vehicles, outbuildings, storage areas, and/or sheds associated with or near their residence and/or cultivation facility, or in yard areas surrounding such premises, otherwise attempting to conceal its presence.

79. Marijuana manufacturers often use vehicles to transport marijuana, equipment, and supplies for the cultivation and distribution of marijuana to and from the cultivation site, as well as to and from the conspirators' residences, including their garages and outbuildings, such as sheds or barns.

80. The parcels of property on which marijuana manufacturers maintain cultivation facilities are often listed under fictitious names instead of the true names of the manufacturers. Conspirators in marijuana cultivation who have multiple cultivation facilities typically keep evidence of the location and ownership of such property at the cultivation sites (including inside buildings or other outlying structures on the sites), on their persons, in vehicles, or at their residences, including personal letters and notes, phone bills, loan payment receipts, utility bills, rental agreements and documents, deeds, canceled mail, canceled checks, envelopes, keys, photographs, audio and video tapes, property tax records, escrow documents, assessor's information, payment records and receipts for method of payment, and other indicia of occupancy, residency, control, or ownership of the premises and things described in this warrant.

81. Marijuana manufacturers often maintain at their residence personal records and ledgers evidencing their activities in order to keep track of the ordering, purchasing, storage, distribution, and transportation of marijuana. Even after the marijuana is cultivated and sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.

82. Marijuana manufacturers earn sums of money and often try to legitimize these profits. In order to do this, they attempt to secure, transfer, and conceal the money by, (among other methods): (a) placing assets in names other than their own name to avoid detection while maintaining control; (b) laundering the money through what appear to be a legitimate

business or businesses; (c) hiding the money in their homes, safes, and safety deposit boxes; or (d) using the money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found at their residence, in their vehicles, and on their persons.

83. Marijuana manufacturers often maintain large amounts of U.S. currency on hand in order to finance their ongoing drug business. In addition, other assets generated by their drug business, are purchased with cash earned, such as precious metals, and stones, and jewelry, are typically kept by marijuana manufacturers at their residence, in their vehicles, and on their persons to avoid detection by authorities.

84. Marijuana manufacturers often maintain weapons, firearms, and ammunition on their person or at their residences and in their automobiles in order to protect themselves and guard their drugs and drug profits. These weapons and firearms are used and can be used as an instrumentality of the object of their crimes.

85. Marijuana manufacturers often take, or cause to be taken, photographs of themselves, their associates, their property, and their marijuana plants, and usually maintain these photographs in their possession.

86. I know that those involved in the growing and distributing of marijuana use mobile telephones to communicate with customers, suppliers and co-conspirators. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other co-conspirators and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile phones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information. The information stored in a telephone used by a marijuana cultivator is evidence of the associations of the marijuana cultivator, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a marijuana cultivator's mobile telephone can contain evidence of their illegal activities because it shows the communications or planned communications of a marijuana cultivator and the telephone numbers of those with whom the marijuana cultivator communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crimes. Mobile telephones can also contain photographic data files, which can contain evidence of criminal activity; for example, where the user is a marijuana cultivator who took pictures of his/her plants and/or grow site. Mobile telephone companies also store

the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

## REQUEST TO SEAL

87. This Affidavit contains information regarding potential targets, which if left unsealed may jeopardize the very information sought to be gained by these search warrants and arrest warrants. In light of the on-going nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, your Affiant requests that this Affidavit and the resulting Search Warrants and Arrest Warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the Search Warrant and an inventory of any items seized that will be left at the locations of the execution of the Search Warrants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Jeramiah Laudenslager
Special Agent, U.S. Forest Service

Subscribed and sworn to before me on this ___ day of August, 2019.


The Honorable Edmund F. Brennan
United States Magistrate Judge


Approved as to form:


David W. Spencer
Assistant United States Attorney

# ATTACHMENT A-1

<u>Location to be Searched:</u> **1290 Northgate Apt. #35, Yuba City California,** is an apartment located south of Northgate drive and east of E. Onstott Road and directly south-west of the Northgate drive entrance into Northgate Terrace Apartments, which is part of the complex that sits furthest North and closest to Northgate Drive. Unit #35 is the furthest southwest apartment in this part of the complex. This is a white with white trim, two story apartment complex. When entering from the Northgate Drive entrance the porch of Unit #35 can be seen on the second floor which has a window and sliding glass door and cannot be reached from ground level, but is accessible from the south side. The residence is constructed out of white wooden panes and a standard shingle roof. The front of the apartment has 3 windows consisting of two medium windows with standard white blinds and a vertical rectangular window in between with standard white blinds and sits on the second floor and to the right of the four attached apartments. The entrance has approximately 16 stairs that are interconnected with a middle flight deck and black railings. The stairs connect to a shared front porch that is shared with Unit #33. The front door is greenish blue in color with a nickel finished round door knob and cylindrical key lock. A large number 35 is left and slightly elevated adjacent the front door. Above the black marked #35 is a black attached front door entrance porch light, with a round white bulb.

The search of the aforementioned location shall include:

ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, appurtenances thereto, and all other areas within the curtilage.



(Front door of Apartment 35)



(Google Earth Image of Apartment Complex. Yellow Pin Indicates where APT 35 is Located)

## ATTACHMENT A-2

Location to be Searched: **1837 18th Street, Olivehurst California,** is a single story residence located east of Ardmore Avenue and west of Fleming Way. 1837 18th Street is the fourth residence east of Ardmore Avenue on the north side of 18th Street. It is light grey in color with dark grey trim with a composite style roof. The driveway and garage door are located on the southwest portion of the parcel. There is a wooden fence which separates the property with the adjacent property to the west. To the right of the garage door are the numbers 1837, which are gold or bronze in color. To the right of the numbers is a roofed entryway leading to the front door. There are three pillars to the right of the walkway which support that portion of the roof. The front door has a white security screen door which opens outward. To the right of the front door is a large window with white curtains and an air conditioning unit in the right lower corner.

The search of the aforementioned location shall include:

ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.



(Google Earth Street View Image of 1837 18th Street)



(Image of 1837 18th Street)



(Google Earth Image, Red Mark Indicates 1837 18th Street)

## ATTACHMENT A-3

<u>Vehicle to be Searched:</u> A 2003 Toyota sedan, silver in color, California license plate **4XUM692**, with a vehicle identification number of **1NXBR32E43Z056105.** Registered to Martha CHAVEZ at 1837 18th Street, Olivehurst California.



## ATTACHMENT A-4

<u>Vehicle to be Searched:</u> A 2006 Hummer, silver in color, California license plate **5TNU381**, with a vehicle identification number of **5GTDN136968210253**. Registered to Alonzo LOPEZ-VALDIVIA at 1290 Northgate APT 35, Yuba City CA.



## **ATTACHMENT B**

## **ITEMS TO BE SEIZED**

The officers executing this warrant are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Alonso LOPEZ-VALDIVIA, Ramon Eladio CHAIDEZ-AISPURO, Martin Alberto MACIAS, Ramiro Lopez PACHECO, Cecilia TORRES-GODINEZ, and their co-conspirators:  Title 21 U.S.C. Section 841(a)(1) – Manufacture of Marijuana; and Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Manufacture Marijuana.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which officers may search includes

1.     Green t-shirt with white bear emblem and the words "king of the wild" in the emblem. T-shirt with the words "Nike Air" and "air force".

2.     Any controlled substances, including marijuana, or controlled substances paraphernalia, including rolling papers, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, scales, and other weighing devices, drying screens, pouches, backpacks, surveillance/monitoring devices, alarm sensors, storage containers, diluting or cutting agents, and packaging materials, including plastic baggies, large plastic garbage bags, boxes, buckets, tin foil, cellophane, jars, and heat sealers to package marijuana for sale;

3.     Any equipment for planting, cultivating, and/or harvesting marijuana, including irrigation devices, garden hoses, buckets, ground timing devices, electronic watering devices, aerators, PVC pipes, water storage devices, lights, timers, power cords, generators, shovels, rakes, pruning shears, hand-held sprayers, other gardening tools, pesticides, herbicides, starter pots, planter pots, grow pots, paper bags, burlap bags, and plastic storage containers;

4.     Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold, or concealed;

5.     Cellular telephones and other communication devices which could be used to participate in a conspiracy to manufacture and/or distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

6.     Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

7. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug manufacturing and trafficking activities;

8. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks, and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

9. United States currency and foreign currency linked to the manufacture and/or distribution of controlled substances and/or the proceeds of the manufacture and/or distribution of controlled substances;

10. Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

11. Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the manufacture and/or distribution of controlled substances or discovered in the possession of a prohibited person;

12. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

13. All names, words, telephone numbers, email addresses, time/date information, messages, communications, videos, photographs, or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that relate to drug trafficking. This authority to search such mobile telephones includes the following within each mobile telephone:

    a. Incoming call history;
    b. Outgoing call history;
    c. Missed call history;
    d. Outgoing text messages;
    e. Incoming text messages;
    f. Draft text messages;
    g. Telephone book;
    h. Data screen or file identifying the telephone number associated with the mobile telephone searched;
    i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
    j. Voicemail;
    k. User-entered messages (such as to-do lists);
    l. Photographs;
    m. Any passwords used to access the electronic data described above;
    n. Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions;
    o. All information and records related to drug trafficking, including:
        i. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

      ii.   lists of customers and related identifying information;

     iii.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     iv.   any information related to sources of drugs, including clone marijuana plants and/or seeds (including names, addresses, phone numbers, or any other identifying information);

      v.   any information recording schedule or travel;

     vi.   all bank records, checks, credit card bills, account information, and other financial records;

    vii.   records of Internet Protocol addresses used;

   viii.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

p.   Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.